G. GUNDERSON and M. G. Gunderson, Respondents, G. GUNDERSON, Appellant, v. NORTHERN MOTOR COMPANY, a Corporation, and Ed. Paris, Appellants. FRED F. PAGE, E. H. Page, A. F. Page, H. W. Page, Martha Page, Mabel Page, F. A. Schroeder, Ed. Paris, Benj. G. Schroeder and Danube State Bank, a Corporation, Appellants.

(219 N. W. 778.)

**Findings — evidence held to sustain findings in part and not to sustain them in part.**

The evidence examined from which it is held that certain findings of fact of the trial court are sustained by the evidence, and certain other find-

ings of fact specifically enumerated in the opinion are held not sustained by the evidence.

Opinion filed May 17, 1928.   Rehearing denied June 15, 1928.

Corporations, 14 C. J. § 722 p. 490 n. 3, 4.

Appeal from the District Court of Renville County, *Lowe,* J. Modified.

*J. E. Bryans,* and *F. J. Funke,* for respondents, appellants, Northern Motor Company and Ed. Paris.

*P. M. Clark,* and *McGee & Goss,* for appellants Fred F. Page, et al.

BURKE, J.   This is an action for the cancelation of certain stock in the Northern Motor Company, a corporation, of the alleged value of $10,500.

Sometime in the latter part of 1918 and 1919, Fred Page who was engaged with his brothers in banking, farming and in the handling of farm machinery at Mohall, North Dakota, organized the Northern Motor Company, a corporation, with a proposed capital of $25,000 and stock was issued as follows:

| | |
|---|---:|
| Ed. Paris, by invoice | $3,500.00 |
| Ed. Paris | 2,000.00 |
| A. J. Paris | 2,000.00 |
| Fred F. Page, Equity in Real Estate | 1,800.00 |
| E. H. Page | 500.00 |
| Martha Page | 2,000.00 |
| A. F. Page | 2,500.00 |
| H. W. Page | 3,000.00 |
| Mabel Page | 700.00 |
| G. Gunderson | 500.00 |
| M. C. Gunderson | 2,000.00 |

The corporation continued to do business until the 24th day of December 1924, when the plaintiff brought this action, claiming that the defendants, the Page Brothers, kept the record of the Northern Motor Company in the First National Bank, which was managed and operated by the said Page Brothers; that it was agreed that said Page Brothers would deposit in the building account of the Northern Motor Company $12,500; that the Page Brothers did not pay into the motor company building account or furnish any money, property or thing of value in payment for the stock issued to them, and that they falsely

represented to the stockholders that they had paid into the building account of said corporation the sum of $10,500. They further alleged that the stock issued to said Page Brothers, and their wives, has been fraudulently pledged to the defendant, F. A. Schroeder, who holds the said stock with full knowledge of all facts.

The defendants claim that they invested in the Northern Motor Company the sum of $23,456.18; that they withdrew from said amount the sum of $10,000, the proceeds of a loan, leaving the sum of $13,-456.18 for which stock was issued in the sum of $10,500 leaving a balance of $3,956.18.

There is no record of the building account except such as was kept by the Page Brothers in the books of the First National Bank. Fred Page purchased all the material that went into the building of the garage, and had general supervision of its construction.

The court found as a fact that the Page Brothers had put into the Northern Motor Company in money and service $19,116.17 from which there should be deducted the sum of $15,500 leaving a credit balance to the Pages of $3,616.17 for which they were entitled to stock, and as a conclusion of law, that upon the payment of $83.83 they were entitled to stock in the said motor company of the par value of $3,700, and all stock issued in excess of that sum to the defendants was ordered cancelled, and that the defendants F. A. Schroeder, B. Schroeder and the Danube State Bank took the said stock with full knowledge of all the circumstances, and the said stock in excess of $3,700 in value was ordered cancelled.

From the judgment thereon the defendants appeal, and the plaintiff, the Northern Motor Company, defendant, and Ed. Paris filed a cross appeal alleging error in the court's finding that the defendant was entitled to the profits of the machine business which he operated through the Northern Motor Company. We are of the opinion that there is no merit in the cross appeal. It is conceded that the Northern Motor Company was handling Ford products, and could not under its contract with Ford, handle any other products that entered into competition with Ford products; that while Page Brothers conducted the business through the Northern Motor Company's account in the bank, they actually handled the business themselves, paid for the machinery and made the sales and were entitled to whatever profits were made.

The trial court in his memorandum opinion makes from the record a statement as follows, to wit:

| | | | | |
|---|---|---|---|---:|
| Item | No. | 1, | Nov. 15th, 1919, by check | $5,000.00 |
| " | " | 2, | Dec. 31st, 1919 | 2,000.00 |
| " | " | 3, | Nov. 22nd, 1920, by check | 2,000.00 |
| " | " | 4, | McMahon lot, by cash | 1,000.00 |
| " | " | 5, | April 17th, 1920, Lindermann accommodation note | 2,500.00 |
| " | " | 6, | Sept. 16th, 1920, by check, Gunderson money | 1,875.00 |
| " | " | 7, | Sept. 16th, 1920, by check, Gunderson money | 1,100.00 |
| " | " | 12, | Claimed salary of A. F. Page | 300.00 |
| " | " | 14, | Claimed for use of team and labor of E. H. Page | 24.00 |
| " | " | 15, | Claimed for unloading tile | 45.00 |
| " | " | 17, | Claimed for hauling gravel | 334.45 |
| " | " | 18, | Claimed for taxes paid by Pages | 74.16 |

$16,252.61

This leaves the following items still in dispute:

| | | | | |
|---|---|---|---|---:|
| Item | No. | 8, | J. J. Gilseth acct. claimed to have been assumed | $2,000.00 |
| " | " | 9, | Claimed profits from machinery | 1,091.70 |
| " | " | 10, | Jan. 17th, 1921, claimed to be W. F. Schroeder loan | 500.00 |
| " | " | 11, | Claimed salary of Fred Page | 1,000.00 |
| " | " | 13, | Claimed for use of engine on basement | 180.00 |
| " | " | 16, | Nov. 15th, 1919, profits from First National Bank | 1,271.86 |

$6,043.56

The court further allowed item no. 9, profit on sale of machinery, for $1,091.70, to which we have already referred, item 16, profit from First National Bank $1,271.86, and the Schroeder loan of $500 to the Page Brothers which went into the building. Items 8 and 11 were disallowed. Item 8, the defendants claim, is a $2,000 payment by note made by the Page Brothers to the Gilseth Lumber Company for material that went into the garage, and for which note the Gilseth Lumber Company gave the Northern Motor Company credit on its books for $2,000.

. Gilseth testified, that he furnished to the Northern Motor Company material for the building of the garage in the sum of approximately $10,000. He testified, "that there were bills due to be paid for material furnished and I went over there to get the money to pay the bills." This bill which he took over at that time was introduced in evidence as "ex. I" and "ex. I 1." It is for $9,682.37. Fred Page purchased all the material that went into the building of the garage and paid all the bills, and it was to Fred Page that Gilseth would naturally go for the payment of a claim against the Northern Motor Com-

pany.  He testified further, that at the time he took the bill "ex. I" and "ex. I 1" over, "Fred Page told me that they were short, and he said you go ahead and draw on the bank and we will honor the checks, which I did."  Who was short?  Not the bank, if the bank was short it could not pay Gilseth's checks.  It must have been the Northern Motor Company, the debtor, that was short, and could not pay, but Gilseth was told to go ahead and draw on the bank, and his check would be honored, and he says, "I did."  He says, "later on I was called to the bank, and Page said to me, at the present time we are short and if you can help us out by giving your note to the bank for $2,000 it would be appreciated, and he says, the collections are near at hand and you will not be liable for this note which will take care of itself when collections come in, and I gave the note.  I do not know where the note is now, to the best of my recollection it was renewed in December."  "Later Fred Page said, collections have not been coming as freely as expected, and they could not take care of the note, so he says, I will give you my note in protection of yours, and you will never be held liable for your note to the bank, and he gave me a note for $2,000 at that time."  "That is the only note that I received from the Pages.  I could not remember whether there was anything said about any balance due the Northern Motor Company.  He came back three times and stated that he had talked with the parties at the bank and said that it was understood that I would not be liable for the note if I renewed."  Referring to the Lumber Company's books in which the Northern Motor Company's account was kept "Exhibit 38 and 39," he said:  "The account is in my handwriting.  I kept that record myself, this is my handwriting up to the time the balance has been struck off."  He testified that "ex. I" and " Exhibit I 1" is a correct account of the material furnished to Fred Page for the Northern Motor Company, during the year 1919, that all the material furnished was not entered in the legder, but that the bill "Exhibit I" and "Exhibit I 1" which he presented is correct and was made up from the original entries, or as he said, "what I called the yard books which have been lost or destroyed."  The credits, however, made on page 327 of "ex. 39" agree with the charges in the bill "Exhibit I" and "Exhibit I 1" viz., the amount in the bill being $9,682.37, and the credits allowed on page 327 being also for $9,682.37, so according to

this book the full amount of material furnished in 1919 was paid for and credited even though the full amount of material furnished was not entered in the ledger. The account is carried forward from page 168 of exhibit 38 to page 278, where the Northern Motor Company is credited with $500 (the F. A. Schroeder loan to Page Brothers allowed by the trial court) and by note for $2,000, this note is entered December 25, 1920, and just below it there is entered in red ink on January 1st, 1920, "To balance $313.49" thus showing that the books were balanced at that time, and the Northern Motor Company only owed the Gilseth Lumber Company $313.49, and Gilseth testified that was later paid. There is no claim that there is any mistake in the entries in exhibit 38, except, Gilseth testified, "I put it on the credit side for memory." If that was the purpose why did he strike a balance, and if it was only an accommodation note between him and the Page Brothers why did he not enter it in the Page Brothers' account in the same book, and make some memorandum showing that it was an accommodation note instead of crediting it as a payment on the Northern Motor Company's account? Page testified that the note which Gilseth gave to the bank was not an accommodation note, but was given as a renewal of two notes for $1,000 each as shown by "Exhibit W," deposit slip, a deposit by note for $1,000 March 29, 1920, and "Exhibit V," deposit slip, showing a deposit for $1,000 May 7, 1920, and "Exhibit X" showing the deposits in checking account, and the note which Page Brothers gave to the Gilseth Lumber Company was given as a payment on the account of the Northern Motor Company, and was received by the said lumber company as a payment. It is conceded that Fred Page had authority to purchase and pay for all the material that went into the building and it follows that he had authority to make an agreement with the lumber company by the terms of which the Page Brothers were substituted as debtor in place of the Northern Motor Company to the amount of the note, with intent to release the Northern Motor Company. Such an agreement is called in law a novation. Comp. Laws 1913, subd. 2, § 5830. We are of the opinion that the Gilseth Lumber Company's book "Exhibit 38," together with the whole record, shows a novation, and that item of $2,000 should have been allowed. Item 13, claim for use of engine in construction of the basement in the sum of $180 was disallowed by the

56 N. Dak.—58.

trial court. Ed. Paris gave Page Brothers an accommodation note upon which the bank loaned the money that paid for the engine, when the engine was sold later by Page Brothers, the note was paid and delivered up to Paris. Page Brothers bought and paid for the engine and later sold it, but on account of using it, it was sold for cost. It belonged to the Pages, and since there is no dispute over its use, or the value of its use, this item of $180 should have been allowed. Item 11, claim of Fred Page, for service as superintendent of the building of the garage.

It is conceded, that Fred Page made all the contracts for the purchase of material, that he employed and paid for all the labor, organized the corporation, purchased the lots upon which the garage was built, and it is undisputed that, while the building was in process of construction that he would be called several times a day to the building, that he did some work himself and nearly all before there was any corporation. He states that at the time of organization he had a statement of the cost of the building. Ed. Paris saw the statement, but denies that he checked it over. Gunderson says, he did not see the statement, but Paris told him that he had seen it, that it was made out on long narrow strips of paper, that he asked Page for it, but Page could not find it. Page testified that he had it in the bank. The bank failed in November 1921, went into the hands of a receiver, the statement was misplaced but was later found by an employee and was introduced in evidence as Exhibits "T" and "U." Exhibit "T" purports to be a statement of checks issued on building account, and complete statement of cost of building, on long narrow strips of paper, and Exhibit "U" is the adding machine strip, both showing the cost of the building to be $25,534.49. Exhibit "T" is an itemized statement giving, name and amount paid to each individual. When the bank closed in November, 1921, all the checks were turned over by Page to Ed. Paris, president of the Northern Motor Company, who said, he put them in a box in the basement and they were destroyed by water. Since the names and amounts paid are given in the statement it would have been easy to check up and ascertain if the parties named were actually paid, but no such attempt was made. The Gilseth Lumber Company's ledger "Exhibit 39" shows payments by check in December 1919 for $4,682.37 and $3,000, and one for $2,000 all listed in "Exhibit T" as payments in December, 1919. There is nothing to discredit

"Exhibit T," except that it was lost for a time while the bank was in the hands of a receiver. There is no testimony that the building did not cost $25,334.49. There was a great deal of work in employing and paying labor, in supervising the construction, and it would seem that Page should be paid. The evidence in our opinion justifies an allowance of five hundred dollars, and claim is allowed at that sum.

It is also the contention of the plaintiff, that Ed. Paris gave a note for $2,500 for the building account with the understanding that when the stock was issued that amount of stock would be issued to Ed. Paris, and that amount of stock was issued to Ed. Paris, and when issued was pinned to his note in the bank and subsequently when the bank was reopened the note with the stock attached was sold to one Kinzley. This note for $2,500 is dated September 25, 1919, and it is the contention of the defendants that it was given in part payment for the draft, "ex. B," dated September 25, 1919 for $5,399.89. About that date the record shows that Ed. Paris received a car load of tractors, and the draft, "ex. B," was issued in payment of the sight draft accompanying the bill of lading for the tractors. The record seems to bear out the contention of the defendant. On page 198 of the record Ed. Paris states, that his first payment to the building account of the Northern Motor Company was a .check for $1,500; he says, "I would not be sure of the year whether it was in 1919 or 1920." He is shown "Exhibit 29," a check for $1,500, which he identifies as the check referred to. Again on page 200 he says, that he did not pay for any stock in any form prior to the time he gave this check. On page 201 Paris states, that he thinks it was in the fall of 1920, that he gave the note for the $2,500. It further appears from the record, that Ed. Paris turned over to the Motor Company on accessories valued at $3,500 for which he was to receive and did receive $3,500 worth of stock. He also received $1,500 worth of stock for the $1,500 check.

On page 237 Mr. Paris stated, "I would not swear that the proceeds of the $2,500 note were not included in the check for $5,389.80. I did not know whether I got the benefit of it in that way." He states on page 239 that he got $8,000 worth of stock, $500.was issued to him for back salary and a Ford car. An examination of the record shows, however, that there was no stock issued to him for back salary and a

Ford car, and $500 worth of his stock was cancelled by the trial court leaving him $7,500 worth of stock. This is all the stock that he was entitled to according to his own testimony and the record. It is the contention of the defendants that the first $2,500 note was given as part payment for the sight draft which accompanied the bill of lading for the tractors, and that subsequently Paris' father, A. J. Paris, gave an accommodation note for his son for $2,500 upon which stock was issued to Ed. Paris for $2,500. This accommodation note the defendant claims was paid from the sale of tractors and machinery which Ed. Paris had on hand when the corporation was organized, the proceeds from the sale of which were applied on the A. J. Paris note until it was paid in full, and taken out of the bank. The note given by Ed. Paris in September, 1919, was renewed and $2,500 worth of Ed. Paris' stock was pinned to that note as security and the note subsequently sold to Kinzley. This seems a reasonable solution as it is hardly possible that the Pages would pay a draft for over $5,000 without something to show for it. On page 266 of the record Paris states: that the accommodation note my father gave for $2,500 I got back. They used it and handed it back to me.

The building of the garage was commenced in the fall of 1919, and there were deposits in the building account as follows:

November 15th, 1919, by Fred Page ................................... $1,271.86
December 6th, 1919, by Page Bros. ................................... 5,000.00
December 10th, 1919, by Ed. Paris ................................... 1,500.00
December 17th, 1919, by Gunderson ................................... 2,500.00
December 31st, 1919, by Page Bros. ................................... 2,000.00
Northern Motor Company note to bank, Sept. 9, 1919 ................ 2,000.00

These deposits amounting to $14,271.86 were all the deposits in the fall of 1919. It could hardly have been in the fall of 1919, that Fred Page told Paris that he would have to have more money, for that is the fall they started building, and they had $14,271.86 more than half the cost of the building. It must have been in the fall of 1920, when the A. J. Paris note was given. Paris says several times that he thinks it was in 1920, but it might have been in 1919, but he is sure, and states over and over, that the first payment he made to the building account for stock was the check, "ex. 29," for $1,500. It is dated December 10, 1919, he is given credit for it on the same date in the Northern Motor Company building account, and since

that was his first payment for stock, the note which he gave on September 25, 1919, nearly three months prior to the date of the check, could not have been for stock and must have been a payment on the draft as the defendants contend.

It is the further contention of the plaintiff, that there should be a deduction of $3,000 of money claimed to have been deposited in the building account by Page Brothers and that stock for that value should be cancelled. In support of this contention the plaintiff, Gunderson, testified,

"In the fall of 1920, Fred Page came to my office, and said that they were short in some of their accounts, like the Northern Motor Company and their own; that the bank examiner was objecting, and asked me for $5,000, I gave him a check for $5,000. He did not say that he wanted the money as an advance for grain to be delivered later. I received a credit to my account for $3,000 and a check for $2,040.22 later in payment."

The check referred to was introduced in evidence as Exhibit 31. Continuing he said,

"Grain was delivered at the elevator that fall for which I paid by check in the neighborhood of $3,000 all payable to the Page Brothers. I have not got the scale records, the scale records were destroyed. I issued storage tickets or cash checks for all the grain."

Checks payable to the Page Brothers for grain were introduced in evidence "Exhibits 31–32–33–34–35–36–37 and 45."

Mr. Gunderson admits that he drew a sight draft on his grain commission house, Benson-Quinn Company, Minneapolis, for the $5,000 which he turned over to the Page Brothers and which he obtained on his grain account, and that was his method of getting money for the purchase of grain. It is the contention of the Page Brothers that they had four hundred acres in wheat that year, that they raised 3,500 bushels; and that they went to Gunderson in September 1920, represented that they had this wheat which was not threshed, that they wanted an advance on it, and that Gunderson advanced them $5,000 on grain to be delivered when threshed, that later the $5,000 was paid by delivery of wheat, and a check for $2,040.22. Paris claims that Pete Page came to him in the fall of 1920, and asked him to sign the check, "Exhibit 9" for $3,000 stating that Gunderson wanted his

money, and he Paris, signed the check.  Pete Page testified that Paris brought the check to the bank, and said he wanted to give Gunderson $3,000.  He asked me to draw the check, I did and he signed it.  The check is a regular Northern Motor Company check and Paris had custody of the check book."

Fred Page testified, that he knows nothing about it, and that it was not issued in payment of any of his, or Page Brothers' debts.  Paris paid this out of the business account and while he says he did not keep regular books he claims he did keep a charge account.  If he paid this money for the Pages, it should have been charged to them in his charge account.  No charge account was produced and he does not claim that it was charged to Page Brothers.  It does not seem possible that such a large sum of money would be paid out by a man in business for over twenty years without some record of it.  If there was a record it should have been produced.

The Pages claimed that they raised 3,500 bushels of wheat in 1920. A part of the land was rented from which they received only half the crop.  It is not clear from the record just how much of the 3,500 bushels were raised on the rented land.  They have no records, and the oral testimony given more than five years after the crop was disposed of, is not satisfactory.  There are many things, however, in the record not satisfactory to a court of equity.  It seems very improbable and hardly possible, that a business man engaged in the business of buying grain for years would draw on his grain account on a commission house for the sum of $5,000 for the purpose of putting that money in a bank to satisfy the bank examiner, even though, he was a stockholder and a director in the bank.  Certainly he knew that it was irregular and that the commission house would not let him have the money for that purpose.

The record is full of irregularities in the conduct of the business of the Northern Motor Company, in the business of the bank, and in fact in all the transactions of the stockholders with each other.  Ed. Paris, president of the Northern Motor Company, and manager of its business in the garage, and machinery business, handling all the Ford products, testified, that he kept no books, but a charge account.  That he was not a bookkeeper and that he was told that he would not need to keep any books, and while he was president of the Northern Motor

Company, without any authority he issued to himself five shares of stock in the Northern Motor Company, which were cancelled by the trial court. He testified, that while he was president and manager of the Northern Motor Company, that he signed a check at the request of Pete Page for $3,000 payable to Gunderson on the Northern Motor Company account knowing that it was not an indebtedness of the Northern Motor Company. The twenty shares of stock issued as collateral security to the accommodation note of A. J. Paris, with the understanding that when the note was paid the stock was to be cancelled, was in the stock book with the five shares of stock to Ed. Paris, when Percy Clark, one of the attorneys for the defendant, and A. F. Page had occasion to examine the stock book just before this action was commenced and they were not there at the time of the trial. Clark's testimony is corroborated by A. F. Page.

Paris testified, at one time it had been at his house all the time, again that he did not know where it was, and later, that his father purchased the stock certificate for twenty shares paying therefor $2,000. A. F. Page, secretary of the corporation testified, that at directors meeting in 1923, and 1924, he wrote the minutes in long hand at each meeting, and thereafter transcribed them in typewriting, and placed the same in the minute book of the Northern Motor Company. These minutes were signed by Page as secretary, and when he examined the book just before the beginning of the action they were gone. The minute book was introduced in evidence, and the last meeting of the board of directors of the Northern Motor Company in the book is that of January 18, 1922, the minutes of the meetings of 1923 and 1924 are not there. When the bank closed in the fall of 1921, Fred Page turned over to the Northern Motor Company all of the checks issued by Fred Page and Page Brothers on the building account and from which "Exhibits T and U" were made up. Paris said, they were put in the basement and destroyed by water. Pete Page said they were kept in boxes in the office and only invoices were put in the basement. Just prior to the beginning of this action all the papers and documents relating to the account of the Northern Motor Company were sent to the office of plaintiff's attorney in Mohall, North Dakota. The scale records of the wheat deliveries were destroyed prior to 1921, although they had checks which they claim were issued in payment of the

wheat. The checks which Fred Page delivered to Paris, Paris said were destroyed, but he produced the $3,000 check, which is the basis of the Gunderson claim, and the $1,500 check which he issued December 10, 1919, but the evidence which might explain the whole situation, the plaintiff claims was destroyed, while in the custody of Ed. Paris, one of the plaintiffs.

This corporation began to do business early in 1920. The defendants' claim for money invested in the Northern Motor Company was accepted and stock in the sum of $10,500 was issued to them. There never was any question raised until in December, 1924, when the defendants received an offer from Ed. Paris to buy or sell. Page Brothers accepted the offer, but before the deal could be completed, Gunderson made a demand upon them to buy his stock, and the Page Brothers would have bought his stock, but they could not finance so large a deal at that time. Gunderson told them at the time, that if they did not buy his stock he would make them sorry. Not being able to finance the whole deal the stock was not purchased and this action was commenced.

We are of the opinion that the plaintiff has failed in his proof. There is no evidence that the building did not cost $35,534.49. All the money that these plaintiffs put in this building was $6,500. The Pages put in the balance, besides the proceeds of the Linderman note $2,500, and check for $1,100 which according to undisputed evidence and the findings of the trial court went into the business account of the Northern Motor Company.

There is another reason why this stock cannot be cancelled. The bank failed in November, 1921, and F. A. Schroeder, of Danube, Minnesota, a stockholder and director of the First National Bank came up to Mohall in June, 1922 to assist in opening the bank. Schroeder took all the Page notes out of the bank, and all the stock owned by the Page Brothers was pledged as security for these notes, except five shares which were in the bank as security for $500, and which was taken out by B. G. Schroeder, sometime after the bank opened. It is not disputed that the Schroeders paid value for the notes which amounted to $8,500. There was no evidence of any knowledge of fraud on the part of Schroeders or the Danube bank offered by plaintiff, except in rebuttal, Mr. Clifford testified that when the bank was opened in June, 1922, that Mr. Schroeder said to him that the Page

Brothers should turn over to the bank whatever they had in the Northern Motor Company for the reason that they had no money and put no money in the Northern Motor Company. It is clear from the record that Schroeder meant by that statement that the money that the Pages put into the Northern Motor Company was the bank's money, and therefore, Page's stock should in justice be turned over to the bank. To open the bank, Schroeders bought and paid for notes amounting to $8,500, took all of the Page stock as security, and are entitled to hold it all until the debt is paid.

We are of the opinion that the findings of the trial court relating to the Gilseth account, the claim for use of an engine on building, the claim of compensation to Fred Page for superintending, purchasing material, employing, paying labor and personal supervision of the building of the garage. Ed. Paris' claim and the finding against F. O. Schroeder, B. G. Schroeder and the Danube State Bank the Gunderson claim are not sustained by the evidence, and that all the other findings of the trial court are sustained, and as thus modified the judgment of the trial court is affirmed and the case is ordered dismissed.

NUESSLE, Ch. J., and BIRDZELL, and CHRISTIANSON, JJ., and ENGLERT, Dist. J., concur.

Mr. Justice BURR, being disqualified, did not participate, Honorable M. J. ENGLERT, Judge of First Judicial District, sitting in his stead.